## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

WENDY BENSON,            )
                                   )
      *Plaintiff*,         )
                                   )    CIVIL ACTION FILE NO.
v.                         )
                                   )    1:16-CV-04638-CAP-RGV
SOLVAY SPECIALTY POLYMERS   )
USA, LLC                 )
                                   )
      *Defendant*.        )
                                   )

## PLAINTIFF'S RULE 72 OBJECTIONS TO MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff Wendy Benson files her Objections to the Magistrate Judge's Final Report and Recommendation (R&R) regarding Defendant's motion for summary judgment on Plaintiff's claims of sexual harassment, state law claims of assault, battery, negligent supervision, and negligent retention, pursuant to Fed. R. Civ. P. 72 and 28 U.S.C. § 636(b)(1). (Dkt. 53). Plaintiff respectfully argues that the Magistrate Judge's R&R is in error and should be rejected.

## I. <u>SUMMARY OF ARGUMENT</u>

Ms. Benson was the victim of co-worker and supervisor sexual harassment while working for Defendant. Ms. Benson had worked for Defendant for sixteen

months. During that time, as detailed below, Ms. Benson was sexually harassed on a near daily basis for eleven out of the sixteen months that she was employed by Defendant by three main perpetrators.

Ms. Benson had a co-worker with supervisory authority, Morgan Prince, who put his hand on her inner thigh, near her crotch to pick her up; she had to deal with his being overly friendly, giving her uncomfortably close hugs, making comments about her body, touting his ability to perform oral sex, constant requests for dates with invitations to spend the night at his home to show her his oral sex skills, and calling her "sugar britches".

Ms. Benson had to deal with another co-worker, Junior Tanner, asking her to meet him outside of work; asking her if she had ever been with a "chocolate man"; telling her he liked her tan; asking her to send him nude photos of herself; asking when they were going to have intercourse; stating that he was going to "cum" down her throat; and threatening that he was going to "F" her if he ever got her on the night shift alone.

Ms. Benson subsequently also had to deal with co-worker, Michael Parks, grabbing and trying to hold her hand, referring to her as "babe", touching her buttocks and breasts on a near daily basis; giving inappropriately close hugs from behind; telling her he had sexual fantasies about her; showing her his erection; and

telling her that he would masturbate to thoughts of her. Ms. Benson had told each of her harassers to stop and that their actions were not welcomed.

Ms. Benson made complaints regarding the harassment to Defendant's Human Resources Manager, Keri Williams, her team leader, Kenneth Rice, and she made numerous and frequent complaints to her immediate supervisor, Kenneth Hawkins, yet nothing was done to prevent or correct the continued harassment.

Despite admissible evidence of all the above, the Magistrate Court largely ignored the above evidence claiming that Ms. Benson's allegations of harassment lacked "…sufficient particularity to support her claims of harassment." (Dkt. 53 at 42). This ruling skews the entire R&R in Defendant's favor. The R&R fails to adhere to the standard of review on summary judgment, finding additional facts and inferences therefrom in favor of the Defendant and not Ms. Benson. The R&R discounts the frequency and severity of the harassment suffered by Ms. Benson in examining her sexual harassment count.

The R&R also found that Ms. Benson unreasonably failed to take advantage of the Defendant's anti-harassment policy by failing to report the alleged harassment through alternative channels despite Eleventh Circuit precedent holding that Ms. Benson was not required to make additional complaints to other members of management to establish that Defendant had notice of the sexual harassment which

in turn triggered a duty to take responsive and remedial action.

Further, the R&R concluded Defendant could not be liable because Prince's and Parks' assault and battery involved sexual misconduct despite citing that an employer could be liable under the theory of *respondeat superior* if the employer knew or in the exercise of reasonable care should have known of the conduct at issue and failed to correct the conduct. The R&R also recommended that summary judgment be granted in favor of Defendant on Ms. Benson's claims of negligent retention and negligent supervision due to the lack of an underlying tort – however, the R&R did not properly consider Ms. Benson's assault and battery claim and prematurely recommended the dismissal of Ms. Benson's negligent retention and supervision claim.

Accordingly, the R&R should be rejected.

## II.  <u>STANDARD OF REVIEW</u>

Under both Fed.R.Civ.P. 72(b)(3) and 28 U.S.C. § 636(b)(1)(C), this Court reviews objections to the report and recommended order (R&R) of a Magistrate Judge *de novo*. This Court reviews the Magistrate Judge's ruling on non-dispositive issues to determine if it is either "clearly erroneous" or "contrary to law." <u>See</u> Fed.R.Civ.P. 72(a) and 28 U.S.C. § 636(b)(1)(A). Normally, factual determinations fall under the "clearly erroneous" standard, which is deferential, while legal issues

4

fall under the "contrary to law" standard, which calls for *de novo* review. Mixed questions of fact and law are reviewed *de novo*. Wright, Miller & Marcus, Federal Practice & Procedure § 3070.2 (2008)(collecting and discussing numerous authorities).

Summary judgment is proper only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(a). The movant must show that "everything in the record… demonstrates that no genuine issue of material fact exists." Tippens v. Celotex Corp., 805 F.2d 949, 952 (11th Cir. 1986). Genuine issues of fact are those where the evidence is such that a reasonable jury could return a verdict for the non-movant. See Anderson v. Liberty Lobby, 477 U.S. 242, 250 (1986). In ruling on a motion for summary judgment, "'[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014)(quoting Anderson, 477 U.S. 242, 255 (1986)). The court "may not weigh conflicting evidence or make credibility determinations" and if there are "disputed issues of fact, the court may not decide them; rather, [it] must deny the motion and proceed to trial." Jones v. UPS Ground Freight, 683 F.3d 1283, 1292 (11th Cir. 2012).

## III.  MS. BENSON'S STATEMENT OF MATERIAL DISPUTED FACTS

### A.    Background

Ms. Benson began working for Defendant as a temporary employee in September 2014 at their Alpharetta, Georgia location.  (Dkt. 40-14 at 30:25-31:4, 93:24-94:2; Dkt. 40-15 at 159:17-25; Dkt. 1 at ¶ 12; Dkt. 5 at ¶ 12). Ms. Benson worked as a technician in the compounding team on the ZSK40 Extruder Machine (the "Extruder") which is a piece of equipment that mixes various compounds and materials to produce long continuous strands of polymers. (Dkt. 40-13 at 9:3-5; Dkt. 40-4 at ¶13).

Upon placement with Defendant, Ms. Benson underwent a new hire orientation. (See Dkt. 49-6). The Orientation presentation highlighted Defendant's Non-Harassment Policy; however, the actual policies themselves were only accessible via Defendant's intranet. (Dkt. 40-14 at 65:16-66:2; Dkt. 40-3 at ¶8; Dkt. 40-15 at 179:12-18.). The only reporting procedure noted on Defendant's Non-Harassment Policy that was in effect and posted on the intranet during all relevant times herein noted "[a]ny employee who feels that he or she is being harassed or intimidated should report the matter immediately to his/her supervisor. If his or her supervisor is the subject of the report, the employee should report the matter directly to the Human Resources Manager." (Dkt. 49-7; Dkt. 49-1 at ¶¶ 7, 8). Ms. Benson

was trained on the 2015 Code of Conduct Policy that contains "Harassment-free Environment" slides that specifically notes "What should employees do if they experience harassment? Any suspected harassment should be reported to **HR or management**." (Dkt. 49-6 at 10; Dkt. 47 at ¶ 19).

From the start of her placement with Defendant through mid to late 2015, Morgan Prince was the operation lead and shift lead on the Extruder. (Dkt. 49-2 at ¶ 3; Dkt. 40-15 at 197:12-22; Dkt. 49-3 at 2, 4 ,5) At all relevant times herein, Ms. Benson's co-workers on the compounding team were predominantly male, approximately eighty (80) percent. (Dkt. 40-13 at 90-14-17, 160: 10-12). Beginning in November of 2014 through March of 2016, Kenneth Hawkins was the supervisor over employees working on the Extruder, and Ms. Benson's direct supervisor. (Dkt. 40-13 at 8:2-3, 9:23-10-1, 19:8-10, 56:20-22). On December 12, 2014, Ms. Benson was extended an offer of employment to join Defendant as a technician. (Dkt. 40-13 at 39:16-40:10; Dkt. 49-5).

## B.    **Sexual Harassment and Ms. Benson's Ensuing Complaints**

   *i.    Morgan Prince.*

Approximately two months after Ms. Benson was placed at Defendant's Alpharetta facility, Ms. Benson began experiencing sexual harassment. (Dkt. 40-15 at 160:4-13, 161:10). In November 2014, Prince, Ms. Benson's shift

lead, picked Ms. Benson off of the ground and pretended he was going to place her in a dumpster and placed his hand on her inner thigh, near her crotch. (Dkt. 40-15 at 161:10-16; Dkt. 49-2 at ¶ 3). Omar Charles, a technician on the compound team had witnessed the interaction, told Prince to put her down, move his hands, and advised Ms. Benson to report the interaction to Hawkins. (Dkt. 40-15 at 161:10-16, 287:23-25; Dkt. 49-2 at ¶3). Ms. Benson subsequently reported the harassment to Hawkins, who reassured her something was going to be done about Prince. (Dkt. 40-15 at 161:7-163:25).

Shortly thereafter, Ms. Benson was called in to speak about the incident with Williams, wherein she reported Prince for the sexually offensive touching. (Dkt. 40-15 at 162:19-163:11). After reporting the incident, Williams told Ms. Benson the incident was a "he said/she said" situation, dismissed Ms. Benson's complaints of sexual harassment and labeled her a "drama queen." (Dkt. 40-15 at 162:19-163:11). In December 2014, Williams received an anonymous letter which referenced Ms. Benson and noted that "[s]he has already had a situation about people making jokes about her". (Dkt. 47 at ¶ 23; Dkt. 47-9). Ms. Benson was never questioned about the "jokes" she was subjected to. (Dkt. 47 at ¶¶ 25, 27; Dkt. 49-1 at ¶¶ 10, 13). Prince's behavior continued after Ms. Benson was transitioned to a full-time employee. (Dkt. 40-15 at 165:8-13).

Prince would tout his ability to perform oral sex, and would invite her over to spend the night at his home to show her how good he was. (Dkt. 40-15 at 167:20-23, 292:19-24). Despite being admonished by another technician on the team, Prince, again, attempted to pick up Ms. Benson. (Dkt. 40-15 at 161:20-25). Prince was overly friendly, began giving Ms. Benson uncomfortably close hugs, and began referring to Ms. Benson as "sugar britches".  (Dkt. 40-15 at 189:2-10; Dkt. 49-1 at ¶ 16; Dkt. 40-13 at 161: 12-16). Again, Ms. Benson reported the continuing sexually harassing behavior to Hawkins who told her "unless you get hit with an ugly stick, you're gonna have to deal with this." (Dkt. 40-15 at 168:21-169:1, 286:9-287:11).

However, Prince's conduct continued, and Ms. Benson was made to work with him. (Dkt. 40-15 at 168:1-8). Ms. Benson had even requested vacation days to avoid having to work with Prince, and she believed everything would be okay because Hawkins reassured her he would handle it. (Dkt. 40-15 at 167:3-7, 168:7-8, 173:24-174:13).   Ms. Benson also reported the sexual harassment to Rice (Dkt. 40-15 at 177:1-9). On June 19, 2015, approximately one week after attending a Code of Conduct training on June 12, 2015, during a meeting with Williams and Hawkins to address a write up, Ms. Benson made another complaint of sexual harassment against Prince and recounted everything Prince had been doing to her over the months. (Dkt. 40-15 at 188:17-191:21; Dkt. 49-1 at ¶21; Dkt. 40-6 at ¶ 6; but cf. Dkt. 40-14 at

134:7-14; Dkt. 40-14 at 127:1-4).

Williams again told Ms. Benson this was a "he said/she said" situation and there was nothing she could do about it because there were no witnesses. (Dkt. 40-15 at 190:21-25.) Ms. Benson told Williams that Charles was present when Prince grabbed her inner thigh and picked her up off the floor. (Dkt. 40-15 at 190:2-3). Williams interviewed Prince about Ms. Benson's allegations, wherein he admitted to calling her "sugar britches", but denied physical contact. (Dkt. 40-14 at 134:23-137:5; Dkt. 40-6 at ¶6). Despite being a witness to an instance of offensive physical touching, Charles was not interviewed about Ms. Benson's allegations of sexual harassment. (Dkt. 49-2 at ¶ 6).

### ii.    Junior Tanner

During the fourth and fifth week of September 2015, Ms. Benson worked on the same shift as two temporary employees, Tanner and Parks. (Dkt. 49-11 at ¶ 24). During that week, Tanner began making sexually harassing comments to Ms. Benson. (Dkt. 49-1 at ¶24). Tanner asked Ms. Benson to meet him outside of work; asked Ms. Benson if she had ever been with a "chocolate man"; asked when they were going to have intercourse; stated he was going to "F" her if they ever worked the night shift alone on three separate occasions; and told Ms. Benson that he wanted to "cum" down her throat. (Dkt. 40-15 at 258: 24-259:10, 306:13-18).

10

Ms. Benson made complaints of sexual harassment to Hawkins about Tanner and made requests to co-workers to rotate shifts with her. (Dkt. 40-15 at 195:5-8)) Based on her experience with reporting sexual harassment to Williams: the inaction and being labeled a "drama queen", Ms. Benson did not report the sexually harassing comments to her. (Dkt. 40-15 at 194:23-195:4). On September 30, 2015, after going through training on the Code of Conduct, Parks, made a report of sexual harassment on behalf of Ms. Benson. (Dkt. 40-14 at 139:8-140:8; Dkt. 40-15 at 192:1-193:14). Ms. Benson testified Parks was present while Tanner was making these sexually harassing comments to her. (Dkt. 40-15 at 192:7-193:14). There was subsequently an investigation into the complaint made on Ms. Benson's behalf and Tanner's placement was terminated.  (Dkt. 40-15 at 192:1-193:25; Dkt. 40-14 at 141:4-144:2).

    *iii.*    *Michael Parks*

Despite making a complaint of sexual harassment on Ms. Benson's behalf, Parks began to sexually harass Ms. Benson. (Dkt. 40-15 at 208:18-209:13). Parks initially started harassing Ms. Benson around the fourth week of January, by grabbing and trying to hold Ms. Benson's hand and referring to her as "babe." (Dkt. 40-15 at 309:19-310:5; Dkt. 49-1 at ¶ 29). Ms. Benson would tell Parks to stop and that his actions were not welcome. (Dkt. 40-15 at 310:4-5; Dkt. 49-1 at ¶29). Ms. Benson made complaints of sexual harassment regarding Parks to Hawkins. (Dkt.

40-15 at 278:18-279:6, 310:5). Hawkins assured her he was going to handle it and remove Parks from Ms. Benson's shift. (Dkt. 40-15 at 279:3-6, 282:12-16; Dkt. 49-1 at ¶32). Additionally, Ms. Benson made complaints of sexual harassment about Mike Parks to Ralph Glover, another technician on the compounding team, and told him to tell Parks to keep his hands off of her. (Dkt. 40-15 at 252:12-21).

Despite Ms. Benson's complaints, the sexual harassment continued, and Parks was not removed from working with Ms. Benson. (Dkt. 49-10; Dkt. 49-1 at ¶32). Parks would wrap his arms around Ms. Benson and hug her from behind with his arms grazing Ms. Benson's breasts, show Ms. Benson his erection, tell Ms. Benson he was not intimate with his wife since the birth of their child, tell Ms. Benson he dreamed about her, and tell Ms. Benson he would masturbate to thoughts of her. (Dkt. 40-15 at 248:2-20, 286:7-290:5). In addition, Parks would touch Ms. Benson's buttocks when she would bend over to pick up pellets out of the Extruder, reach across the computer and touch her breasts very frequently, on a near daily basis. (Dkt. 40-15 at 248:2-20, 286:7-290:5; Dkt. 49-1 at ¶¶ 30, 31, 41).

Ms. Benson continued to make complaints of sexual harassment to Hawkins. (Dkt. 40-15 at 279:3-6, 282:12-16; Dkt. 49-1 at ¶32). After Ms. Benson's complaints of sexual harassment regarding Parks, she continued to be scheduled to work overnight shifts with Parks alone, with no one else in the building.  (Dkt. 40-15 at

203:18-23; Dkt. 49-1 at ¶32). For example, one of the nights she was scheduled to work with Parks, there was a scheduled power outage and the whole building was dark. (Dkt. 40-15 at 203:24-204:10; Dkt. 49-1 at ¶32). Ms. Benson went to the locker room to use the restroom where it was pitch black, and Parks followed her in. (Dkt. 40-15 at 203:18-23; Dkt. 49-1 at ¶32). Luckily, Parks did not enter the restroom; however, Ms. Benson addressed this incident with Hawkins the next day and asked him why he would schedule her to work with her sexual harasser when there was a scheduled power outage in the building, specifically noting that Parks could have raped her. Even with this complaint, Hawkins did not change Ms. Benson's schedule. (Dkt. 49-1 at ¶32).

On March 2, 2016, Ms. Benson was called into a meeting with Williams and Hawkins. (Dkt. 40-15 at 218:9-18; Dkt. 40-14 at 145: 7-9; Dkt. 40-13 at 80:10-84:2, 163:6-165:7). Once Ms. Benson arrived in Williams' office, she was informed that other individuals had made complaints about her. (Dkt. 40-15 at 247: 2-5; Dkt. 40-14 at 145:7-9; Dkt. 40-13 at 80:10-84:2, 163:6-165:7) However, the meeting was not to discipline Ms. Benson. (Dkt. 40-14 at 146:22-147:1) Ms. Benson was completely unaware her interaction with co-workers was going to be the topic of conversation. (Dkt. 40-15 at 247: 2-5).

During the meeting, Ms. Benson realized that Hawkins had not reported any

of the sexual harassment complaints that she had made to him to Ms. Williams. (Dkt. 40-15 at 218: 9-18, 246:22-247:12, 248: 5-20). As a result, Ms. Benson went into detail about how Parks had been sexually harassing her. (Dkt. 40-15 at 248: 5-249:3; Dkt. 40-13 at 61:8-12, 81:15-82:23; Dkt. 40-14 at 147:10-148:24).  Ms. Benson recounted how Parks would wrap his arms around Ms. Benson and hug her with his arms grazing Ms. Benson's breasts, show Ms. Benson his erection, tell Ms. Benson he was not intimate with his wife since the birth of their child, tell Ms. Benson he dreamed about her, and tell Ms. Benson he would masturbate to thoughts of her. (Dkt. 40-15 at 248:2-20, 286:7-290:5). In addition, Ms. Benson stated Parks would touch Ms. Benson's buttocks when she would bend over to pick up pellets out of the Extruder, reach across the computer and touch her breasts on a near daily basis. (Dkt. 40-15 at 248:2-20, 286:7-290:5; Dkt. 49-1 at ¶¶ 30, 31, 41). Because Ms. Benson was unsure whether Hawkins had reported any of her other complaints, Ms. Benson recounted a complaint she had made to Hawkins wherein Parks had referred to Rice as a "motherf**king n**ger". (Dkt. 40-15 at 219:17-23; Dkt. 49-1 at ¶33-34; Dkt. 40-13 at 62:6-13; Dkt. 40-3 at ¶ 38).

On March 3, 2016, Ms. Benson met with Hawkins wherein she again made a complaint of sexual harassment and made a complaint of hostile work environment, gender discrimination, and sexual orientation discrimination. (Dkt. 49-11; Dkt. 49-

1 at ¶34) In addition to reiterating her complaints against Parks, Ms. Benson described a situation that had occurred in the presence of Hawkins when Glover had told her when a man is talking, women don't speak. (Dkt. 40-15 at 227:10-12, 229:9-11; Dkt. 49-11). Additionally, to ensure she had covered all violations of the Code of Conduct Policy that she had witnessed, Ms. Benson made a complaint of sexual orientation discrimination in support of Lukisha Griffin against Parks and Glover. (Dkt. 40-15 at 229:20-230:8, Dkt. 49-11).

Williams followed up with an email requesting to meet the following morning, after Ms. Benson had gone home after working the third shift. (Dkt. 49-12). Ms. Benson responded to the email when she returned to Defendant's facility later that night and stated she had an appointment. (Dkt. 49-12). Despite having an appointment, Ms. Benson made arrangements to attend the meeting and discussed her complaints with Williams and Hawkins. (Dkt. 49-13; Dkt. 49-1 at ¶35). Despite reassuring Ms. Benson that there would be an immediate investigation into her complaints, there were none. (Dkt. 49-1 at ¶36).

On March 10, 2016, due to the Hawkins' and Williams' inaction, Ms. Benson took it upon herself to try to discuss the allegations with Parks, Glover, and Griffin to get the issues out on the table and behind the compounding team. (Dkt. 49-14; Dkt. 49-1 at ¶37). It was only after Ms. Benson's attempt to assuage the situation

failed that Williams began her investigation into Ms. Benson's claims. (Dkt. 40-3 at ¶44).

## IV.  <u>OBJECTIONS TO REPORT & RECOMMENDATION</u>

### A.    <u>The R&R Fails to Take the Facts and Inferences in a Light Most Favorable to Ms. Benson</u>

It is well settled law that at summary judgment, all facts, and inferences therefrom, should be taken in a light most favorable to the non-moving party. The Supreme Court reiterated its long-held standard on summary judgment when it vacated and remanded a decision from the Fifth Circuit in <u>Tolan v. Cotton</u>, 134 S. Ct. 1861 (2014). In <u>Tolan</u>, the Court noted that the Fifth Circuit "failed to adhere to the axiom that in ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" <u>Tolan</u> at 1863 (quoting <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 255 (1986)). Throughout this opinion, the Justices noted that the lower courts resolved factual disputes in favor of the defendant (movant), despite direct contrary evidence put forth by plaintiff, as well as took inferences from the evidence in favor of the defendant, when a jury could reasonably infer in favor of plaintiff. <u>See</u> <u>id.</u> at 1866-68. The Court noted that:

> [W]itnesses on both sides come to [a] case with their own perceptions, recollections, and even potential biases. It is in part for that reason that

> genuine disputes are generally resolved by juries in our adversarial
> system. By weighing the evidence and reaching factual inferences
> contrary to [a plaintiff's] competent evidence, the court below
> neglected to adhere to the fundamental principal that at the summary
> judgment stage, reasonable inferences should be drawn in favor of the
> nonmoving party.

Id. at 1868. In this case, the R&R enunciated the proper standard for analyzing the

facts in a summary judgment motion (Dkt. 53 at 30); however, it failed to apply these

principles and instead took the facts and all reasonable inferences therefrom in a

light most favorable to the Defendant. It is from this flawed view of the facts that

the R&R erred in analyzing the law.

The R&R makes commentary in a footnote about Defendant's Non-

Harassment Policy, which specifically notes "[a]ny employee who feels that he or

she is being harassed or intimidated should report the matter immediately to his/her

supervisor. If his or her supervisor is the subject of the report, the employee should

report the matter directly to the Human Resources Manager." (Dkt. 53 at 8; see also

Dkt. 49 at ¶ 11). But the point is that Ms. Benson utilized the complaint procedure

that was in effect that directly addressed avenues for redress for the harassment that

she was being subjected to. Further, Defendant did not have an employee handbook,

but posted their polices on their intranet. (Dkt. 49-1 at ¶6) The Non-Harassment

Policy was what Ms. Benson had consulted after Prince began sexually harassing

her. (Dkt. 49-1 at ¶ 8).

With regard to the anonymous letters, the R&R notes that "[u]pon receipt of each of these anonymous letters, Williams immediately initiated an investigation, however, she was not able to substantiate any of the alleged misconduct or violations set forth in these letters." (Dkt. 53 at 11).   However, Ms. Benson testified that Williams had in fact not initiated investigations into each letter that was anonymously submitted, Ms. Benson only admitted that she was interviewed by Williams regarding one of the anonymous letters involving her and Harvey Nelson (Dkt. 40-15 at 180:13-181:2, 183:10-184:18; Dkt. 49-1 at ¶¶10, 12-13). Further, an anonymous letter that was submitted on December 12, 2014 contained an allegation that Ms. Benson was being harassed which was subject to Defendant's Non-Harassment Policy. (Dkt. 47-9). [1] This was the first documented instance Defendant was put on notice that Ms. Benson was being harassed during her employment with Defendant. Williams never questioned Ms. Benson about this letter, or any jokes that she was subjected to by her co-workers. (Dkt. 49-1 at ¶ 13].

Additionally, the R&R minimized the sexual harassment Ms. Benson was subjected to by relegating her testimony to mere footnotes. Then, the R&R

---

[1] The anonymous letter specifically noted "[Ms. Benson] has already had a situation about people making jokes about her."

18

mischaracterized Ms. Benson's testimony regarding the sexual harassment she was subjected to by Prince and Parks. Further, the R&R downplayed the frequency of the sexual harassment Ms. Benson was subjected to and the frequency of complaints Ms. Benson made pursuant to Defendant's Non-Harassment Policy.

### i.    Prince

Ms. Benson testified the sexual harassment she was subjected to by Prince began in November 2014. (Dkt. 40-15 at 160:4-13, 161:10). Prince grabbed her inner thigh, near her crotch, and picked her up, pretending he was going to place her in a dumpster. (Dkt. 40-15 at 161-10-156; Dkt. 49-2 at ¶ 3). Ms. Benson made her first complaint regarding Prince following the incident, while she was still a temporary employee, to her direct supervisor, Hawkins. (Dkt. 40-15 at 161:7-163:25). Shortly thereafter, Ms. Benson had a meeting with Williams and made a complaint of sexual harassment, but Ms. Benson was told it was a "he said/she said" situation and Williams dismissed Ms. Benson's complaints and told Ms. Benson there was nothing she could do because there were no witnesses. (Dkt. 40-15 at 162:19-163:11; Dkt. 49-1 at ¶ 18). However, Ms. Benson provided Williams the name of an individual who had witnessed the interaction, Omar Charles; however, Charles was not questioned about what he had seen. (Dkt. 49-1 at ¶ 18, Dkt. 49-2 at ¶ 6). These facts were erringly omitted from the R&R's factual determination.

19

Prince continued to sexually harass Ms. Benson after she transitioned to a full-time employee, and Ms. Benson reported these instances to Hawkins pursuant to the Non-Harassment Policy. (Dkt. 40-15 at 165:8-13). The R&R erroneously found that Ms. Benson did not make any further complaints about Prince from the time she became a full-time employee through June 19, 2015. (Dkt. 53 at 15). Prince continued to sexually harass Ms. Benson and would tout his ability to perform oral sex and would invite her over to his home so he could show her how good he was. (Dkt. 40-15 at 167:20-23, 292:19-24). These facts were omitted from the R&R's relevant factual determinations. Ms. Benson continued to report the sexual harassment to Hawkins and did so frequently, and he reassured her he was going to handle the situation. (Dkt. 40-15 at 167:3-7, 168:7-8, 173:24-174:13, 287:2-15). Additionally, Ms. Benson made a complaint of sexual harassment to another supervisor, Rice, which was entirely omitted from the R&R. (Dkt. 40-15 at 177:1-9). Ms. Benson was frequently and repeatedly sexually harassed by Prince for an eight-month period and Ms. Benson reported the continuing sexually harassing behavior. (Dkt. 49-1 at ¶¶ 16, 23; Dkt. 40-15 at 287:2-15).

ii.    *Parks*

The R&R also fails to take facts in the light most favorable to Ms. Benson regarding the sexual harassment she was subjected to by Parks. Again, the R&R

relegated Ms. Benson's testimony and facts to mere footnotes. (Dkt. 53 at 24). Ms. Benson was initially subjected to sexual harassment by Parks in late January 2016. (Dkt. 49-1 at ¶ 29) Parks' harassment began by referring to Ms. Benson as "babe" and trying to hold her hand. (Dkt. 40-15 at 309-19-310:5; Dkt. 49-1 at ¶ 29). It was shortly thereafter that Parks' actions began escalating in severity. (Dkt. 49-1 at ¶ 30). The R&R mischaracterized Ms. Benson's version of the facts and noted the sexual harassment began sometime after February 2, 2016. (Dkt. 53 at 24).

Ms. Benson testified that Parks would wrap his arms around Ms. Benson and hug her with his arms grazing her breasts, show Ms. Benson his erection, tell Ms. Benson he was not intimate with his wife since the birth of their child, tell Ms. Benson he dreamed about her, and tell Ms. Benson he would masturbate to thoughts of her. (Dkt. 40-15 at 248:2-20, 286:7-290:5). The R&R did not include all of the details of the sexual harassment Ms. Benson was subjected to as alleged. (Dkt. 53 at 24). In addition, Parks would touch Ms. Benson's buttocks when she would bend over to pick up pellets out of the Extruder, reach across the computer and touch her breasts very frequently, on a near daily basis. (Dkt. 40-15 at 248:2-20, 286:7-290:5, Dkt. 49-1 at ¶¶ 30, 31, 41). The R&R also failed to note Ms. Benson's allegations of sexual harassment and the frequency of the comments and the offensive touchings Ms. Benson was made to endure in its factual determination. (Dkt. 53 at 24). The

R&R simply noted that Ms. Benson alleged she made complaints of sexual harassment regarding Parks during a meeting on March 2, 2016 with Hawkins and Williams, all the while noting that Hawkins and Williams denied receiving Ms. Benson's complaints and reports of sexual harassment related Parks. (Dkt. 53 at 24).

Ms. Benson made numerous complaints of sexual harassment to Hawkins about Parks, pursuant to Defendant's Non-Harassment Policy, and requested for Parks to be removed from her schedule. (Dkt. 40-15 at 278:15-279:6, 282:12-16, 288:6-24; Dkt. 49-1 at ¶32). The R&R simply dismisses Ms. Benson's multiple complaints and her palpable fears of working with Parks. (Dkt. 53 at 24). Despite Ms. Benson's complaints, the sexual harassment continued, and Parks was not removed from working with Ms. Benson. (Dkt. 49-10; Dkt. 49-1 at ¶32). Ms. Benson continued to be scheduled to work overnight shifts with Parks alone, with no one else in the building.  (Dkt. 40-15 at 203:18-23; Dkt. 49-1 at ¶32). For example, one of the nights she was scheduled to work with Parks, there was a scheduled power outage and the whole building was dark. (Dkt. 40-15 at 203:24-204:10; Dkt. 49-1 at ¶32). Ms. Benson went to the locker room to use the restroom where it was pitch black and Parks followed her in. (Dkt. 40-15 at 203:18-23; Dkt. 49-1 at ¶32). Luckily, Parks did not enter the restroom; however, Ms. Benson addressed this incident with Hawkins the next day and asked him why he would schedule her to

work with her sexual harasser when there was a scheduled power outage in the building, specifically noting that Parks could have raped her. Even with this complaint, Hawkins did not change Ms. Benson's schedule. (Dkt. 49-1 at ¶32). The R&R failed to include these facts in its determination which showed Defendant's disregard for Ms. Benson's complaints of sexual harassment and her wellbeing. (Dkt. 53 at 24).

Additionally, the R&R failed to include that Ms. Benson met with Hawkins and Williams again on March 4, 2016 to discuss the continuing complaints of sexual harassment she had made to both Williams and Hawkins on March 2nd and the additional complaints of race harassment, hostile work environment, gender discrimination, and sexual orientation discrimination.

Simply put, the R&R failed to find the above facts and inferences in Ms. Bensons' favor, thus violating long-standing law regarding the standard of review on a motion for summary judgment. See Anderson v. Liberty Lobby, 477 U.S. 242, 250 (1986)(genuine issues of fact where such that a reasonable jury could return a verdict for the non-movant). Accordingly, the R&R's factual determinations should be rejected.

**B.    Ms. Benson was a Victim of Sexual Harassment**

To establish a sexual harassment claim under Title VII, Ms. Benson must show:

> (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999)(en banc). Defendant conceded the first three prongs and alleged that Ms. Benson did not satisfy prongs four and five of a prima facie case. (Doc. 40-1 at 13). The R&R correctly found that Ms. Benson subjectively perceived the sexual harassment to be severe or pervasive. (Dkt. 53 at 40 ). However, the R&R erroneously found that Ms. Benson failed to show that the sexual harassment she suffered was objectively severe or pervasive and that there was no basis for holding Defendant liable. (Doc. 53 at 49, 59).

### i.    Harassment Was Severe or Pervasive

The Eleventh Circuit has established four factors to examine when determining the objective component of the fourth element of a sexual harassment claim: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance;

24

and (4) whether the conduct unreasonably interferes with the employee's job performance." <u>Mendoza</u>, 195 F.3d at 1246. The factors are to assist the Court in examining the objective component, but plaintiff does not need to meet each and every one. <u>See</u> <u>Freytes-Torres v. City of Sanford</u>, 270 Fed. Appx. 885, 890-91 (11th Cir. 2008). Instead, courts must view the evidence under the totality of the circumstances and not in a vacuum. <u>See</u>, <u>e.g.</u>, <u>Reeves v. C.H. Robinson Worldwide, Inc.</u>, 594 F.3d 798, 807 (11th Cir. 2010)(en banc)(noting "workplace conduct cannot be viewed in isolation, but rather is to be viewed cumulatively, and in its social context"). And, "[o]verwhelming evidence of one factor can compensate for a lack of evidence of another factor." <u>Marquez v. Mediacom Communs. Corp.</u>, Case No.: 5:12-cv-125-RS-EMT, 2013 U.S. Dist. LEXIS 11758 at *13 (N.D. Fla. Jan. 29, 2013).

Ms. Benson was sexually harassed on a near daily basis for eleven out of the sixteen months that she was employed by Defendant by three main perpetrators. While she does allege that the harassment was on a near daily basis, as detailed above, she adds specific circumstances, and particularity to distinguish this case from the <u>Good</u> case cited by the Magistrate. (Dkt. 53 at 41-42; <u>Good v. Omni Hotels Mgmt Corp.</u>, Civil Action File No. 1:07-CV-0621-HTW-AJB, 2008WL11322930) (N.D.Ga. Aug. 15, 2015), adopted by 2009WL10665813 (N.D.Ga. Jan. 20, 2009).

Here, Ms. Benson was subjected to behavior that she reasonably found to be physically threatening and humiliating from the start of her employment with Defendant.  Ms. Benson testified to almost daily harassment – from November 2014 through June 2015, during September 2015, and from January 2016 through March 2016.  She supported this general allegation with particularity showing that the harassment started shortly after her training was complete and lasted until her termination. Ms. Benson testified specifically that Prince began sexually harassing her in November of 2014 while she was a temporary contract worker with Defendant. Prince gripped Ms. Benson's inner thigh, next to her crotch and proceeded to pick her up, pretending to put her in a dumpster.

Ms. Benson further alleged that she had to deal with Prince being overly friendly; giving her uncomfortably close hugs; making comments about her body, touting his ability to perform oral sex, constant requests for dates, with invitations to spend the night at his home to show her his oral sex skills, and calling her "sugar britches". Ms. Benson reported the incident to her immediate supervisor and subsequently met with Defendant's Human Resources Manager, who dismissed the complaint of sexual harassment as a "he said/she said" situation.[2] From the start of

_____

[2] It is further worth noting that on the same day Ms. Benson was extended an offer for full-time employment, an anonymous letter was scanned directly to Williams

26

her employment through June of 2015, Ms. Benson had to endure sexually harassing comments, uncomfortably close hugs nearly every time Ms. Benson and Prince were scheduled to work together, and two separate instances of Prince grabbing Ms. Benson by her inner crotch and picking her up.

Approximately three months later, Ms. Benson had to deal with Tanner asking her to meet him outside of work; asking her if she had ever been with a "chocolate man"; telling her he liked her tan; asking her to send him nude photos of herself; asking when they were going to have intercourse; stating that he was going to "cum" down her throat; and threatening that he was going to "F" her if he ever got her on the night shift alone. Here, Ms. Benson made complaints of sexual harassment to Hawkins and asked co-workers to rotate shifts with her so she could avoid Tanner's sexually offensive comments.

Another three months later, Ms. Benson subsequently had to deal with sexually harassing behavior from Parks, who ultimately reported Tanner's sexual harassment. Parks started grabbing and trying to hold Ms. Benson's hand and referring to her as "babe". This quickly progressed into much more extreme sexual

---

which made allegations of harassment subject to Defendant's Non-Harassment Policy; however, Ms. Benson was not interviewed about any harassment and no action was taken by Williams or Defendant.

harassment. Parks began touching Ms. Benson's buttocks and breasts on a near daily basis; giving her inappropriately close hugs from behind with his arms positioned under her breasts; telling her he had sexual fantasies about her; showing her his erection; and telling her that he would masturbate to thoughts her. These weren't mere isolated situations as the R&R's recitation of Defendant's facts purport. Ms. Benson was subjected to comments and offensive touching on a near daily basis from Parks. Ms. Benson made numerous complaints about Parks to Hawkins, yet nothing was done to rectify the situation.

Ms. Benson had told each of her harassers to stop and that their actions were not welcomed. She made complaints to Williams, who dismissed her claims as "he said/she said", she made complaints to her team leader, Rice, and she made numerous and frequent complaints to her immediate supervisor, Hawkins, who reassured her he would handle the situation, but would sit idly by. Outside of the disciplinary action in response to Parks' complaint about Tanner, not much was done to prevent or correct the continued harassment or showed Defendant took Ms. Benson's complaints seriously. The R&R's failure to credit Ms. Benson's testimony regarding these factors was in error. A reasonable jury could find Prince, Tanner, and Parks' conduct severe or pervasive.

### 3. Defendant is Liable For Sexual Harassment

The Ellerth/Faragher defense requires an employer to prove (1) that it "exercised reasonable care to prevent and correct promptly any harassing behavior" and (2) that plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id*. "Both elements must be satisfied for the defendant-employer to avoid liability, and the defendant bears the burden of proof on both elements." Frederick v. Sprint/United Mgmt. Co., 246 F.3d 1305, 1313 (11th Cir. 2001).

To establish the second required element of this affirmative defense, Defendant must prove that Ms. Benson either failed to use the company's procedures to report the harassment or that she did not take advantage of any reasonable corrective measures that Defendant may have offered in response to her complaints. Baldwin v. Blue Cross/Blue Shield of Alabama, 480 F.3d 1287, 1306 (11th Cir. 2007).

Defendant's Non-Harassment Policy, states "[a]ny employee who feels that he or she is being harassed or intimidated should report the matter immediately to his/her supervisor. If his or her supervisor is the subject of the report, the employee should report the matter directly to the Human Resources Manager." The irrefutable

evidence establishes that Ms. Benson complied with the reporting procedures outlined in Defendant's sexual harassment policy by reporting Prince, Tanner, and Parks' sexually harassing comments and physically offensive touchings to her immediate supervisor, and that Defendant was legally on notice of the harassment the first time she complained to Hawkins in November 2014. See Watson v. Blue Circle, Inc., 324 F.3d 1252, 1259 (11th Cir. 2003)(explaining that when an employer's policy designates more than one recipient of sexual harassment complaints, the employer has actual notice when an employee complains to one of the designated individuals).

Further, the first documented allegation of harassment subject to Defendant's Non-Harassment Policy regarding Ms. Benson was forwarded directly to Williams on December 12, 2014. The December 12, 2014 letter specifically noted "[Ms. Benson] has already had a situation about people making jokes about her." See Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999)("Courts should view the evidence and all factual inferences therefrom in the light most favorable to the [opposing] party"). Defendant was put on written notice that Ms. Benson was being harassed during her employment with Defendant; yet, Ms. Benson was never questioned about this letter or any jokes that she was subjected by her co-workers.

Moreover, Ms. Benson was not legally required to make additional complaints

to other members of management to establish that Defendant had notice of the sexual harassment, which triggered a duty to take responsive action.  See Breda v. Wolf Camera & Video, 222 F.3d 886, 890 (11th Cir. 2000)(noting that an employee who complains pursuant to an employer's policy "need not be concerned with whether they pursued their complaints far enough up the company ladder.").

Ms. Benson testified that she made her first complaint of sexual harassment in November of 2014 to Hawkins. Ms. Benson subsequently made a complaint of sexual harassment to Williams who dismissed her complaint as a "he said/she said" situation. The December 12, 2014 letter was sent directly to Williams, who failed to follow up on its allegations. Ms. Benson testified she was sexually harassed by Prince following her complaints of sexual harassment and continued making complaints of sexual harassment to Hawkins. Additionally, Ms. Benson requested shift changes to avoid working with Prince and used reasonable care to avoid the sexual harassment where possible. It was not until one week after she had completed her code of conduct training on June 12, 2015, that she lodged another complaint of sexual harassment to Williams. It was only then, after eight months of enduring sexually harassing conduct at the hands of Prince, despite a complaint to Defendant's Human Resources Manager and repeated complaints to her supervisor pursuant to Defendant's Non-Harassment Policy, that there was any type of investigation done.

Ms. Benson also made repeated complaints of sexual harassment against Parks to Hawkins beginning in February of 2016. Ms. Benson had requested, on multiple occasions to work with a different partner and those requests fell on deaf ears, even after she communicated that she feared for her safety when working alone with her sexual harasser. Ms. Benson testified she was shocked during her meeting on March 2, 2016 when she learned Williams had no idea that Ms. Benson had been making complaints of sexual harassment to Hawkins and then proceeded to go into detail about the sexual harassment she had been experiencing at the hands of Parks.

Based on the law and this uncontroverted evidence, the R&R erred when it found Ms. Benson 'unreasonably failed to take advantage of the employer's anti-harassment policy by failing to report the alleged harassment' through the other appropriate alternative channels provided in Solvay's policies . . ." A reasonable jury could find that based on Ms. Benson's prior experience with reporting sexual harassment with Williams that Ms. Benson did not "unreasonably fail[] to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise" when she continued to lodge complaints of sexual harassment to Hawkins, whom she felt more comfortable with.

### C. State Law Claims

The R&R concluded Defendant could not be liable because Prince's and

Parks' assault and battery involved sexual misconduct despite citing that an employer could be liable under the theory of *respondeat superior* if the employer knew or in the exercise of reasonable care should have known of the conduct at issue and failed to correct the conduct. As established above, Defendant had been put on notice that Ms. Benson was subjected to sexual harassment as early as November 2014, yet still failed to take Ms. Benson's complaints seriously which ultimately led to her being sexually harassed on a near daily basis for eleven out of the sixteen months that she was employed by Defendant.

The R&R also recommended that summary judgment be granted in favor of Defendant on Ms. Benson's claims of negligent retention and negligent supervision due to the lack of an underlying tort – however, the R&R did not properly consider Ms. Benson's assault and battery claim and prematurely recommended the dismissal of Ms. Benson's negligent retention and supervision claim.

## V.  <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff Wendy Benson respectfully requests that this Court reject the Report and Recommendation and sustain Plaintiff's Objections, deny Defendant's Motion for Summary Judgment, and set this case for a jury trial of Plaintiff's claims.

Respectfully submitted, this 17th day of July, 2018.

/s/ J. Stephen Mixon
J. Stephen Mixon, Esq.
Georgia Bar No. 514050
steve@mixon-law.com
Gregory Y. Shin
Georgia Bar No. 446452
greg@mixon-law.com

Attorneys for Plaintiff

MILLAR & MIXON, LLC
1691 Phoenix Boulevard
Suite 150
Atlanta, GA 30349
T: (770) 955-0100
F: (678) 669-5039

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| WENDY BENSON, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | CIVIL ACTION FILE NO. |
| v. | ) | |
| | ) | 1:16-CV-04638-CAP-RGV |
| SOLVAY SPECIALTY POLYMERS | ) | |
| USA, LLC | ) | |
| | ) | |
| *Defendant*. | ) | |
| | ) | |

## CERTIFICATE OF SERVICE AND COMPLIANCE

I hereby certify that the foregoing documents were prepared using a Times New Roman 14-point font, and that I have on this date served a copy of Plaintiff's Rule 72 Objections to the Magistrate Judge's Report and Recommendation by filing a copy of the same with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to all attorneys of record.

Respectfully submitted, this 17th day of July, 2018.

*/s/ J. Stephen Mixon*
J. Stephen Mixon, Esq.
Attorney for Plaintiff

MILLAR & MIXON, LLC
1691 Phoenix Boulevard, Suite 150
Atlanta, GA 30349

T: (770) 955-0100
F: (678) 669-5039